No. 66,459

JUDY A. POPE, Conservator, by and for the benefit of the Estate of BOBBY REX JUBY, A Minor, *Appellant* v. EDGAR C. RANSDELL, M.D., *Appellee.*

(833 P.2d 965)

Opinion filed May 22, 1992.

*Gary D. White, Jr.*, of Schroer, Rice, P.A., of Topeka, argued the cause, and *Gene E. Schroer*, of the same firm, was with him on the briefs for appellant.

*Cynthia J. Sheppeard,* of Heck & Sheppeard, P.A., of Topeka, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: This is a medical malpractice action brought by the conservator of the estate of a minor whose injuries allegedly resulted from negligence in the obstetrical care the defendant doctor provided the child's mother. The doctor claims the mother caused the injuries to the child by her use of drugs during her pregnancy. The jury returned a verdict finding no fault on the part of the doctor, other doctors, or the mother. The conservator appeals, claiming the trial court erred in (1) restricting the plaintiff to only one expert witness at trial; (2) not striking the unresponsive testimony of defendant's expert witnesses and not admonishing the jury to disregard the response; (3) limiting plaintiff's cross-examination of defendant and defendant's expert witnesses to questions based on a reasonable medical probability; and (4) improperly allowing defendant to impeach the mother with expunged criminal convictions.

Judy Pope, conservator of the estate of Bobby Rex Juby, seeks to recover damages from Edgar C. Ransdell, M.D., for injuries suffered by Bobby allegedly as a result of negligence in the obstetrical care Dr. Ransdell provided to Bobby's mother, Sandra Juby.

Sandra Juby was admitted to the hospital on November 8, 1976. She was experiencing contractions approximately every five minutes. At 6:15 p.m. on November 8, the hospital's nursing staff notified Dr. Ransdell of Sandra's admission. Dr. Ransdell ordered a vaginal prep, S.S. enema, and the nurse to observe for labor for two hours, and if there was no change, Sandra could be dismissed. Sandra was observed and examined by the nursing staff throughout the evening and night of November 8.

At 7:25 a.m. on November 9, Dr. Ransdell performed a vaginal exam of Sandra and ruptured her membranes to induce labor. Dr. Ransdell then left. According to Dr. Ransdell, although Sandra was having contractions she was not in active labor because there was no progression in the dilation of her cervix. At 8:25 a.m., Dr. Ransdell returned to Sandra's bedside and placed an internal fetal heart monitor. Dr. Ransdell again returned to San-

dra's bedside at 9:25 a.m. and performed a vaginal exam. Sandra's labor had not progressed between the 7:25 a.m. and 9:25 a.m. visits. At 9:25 a.m., there was a deceleration of the fetal heartbeat. At trial, Dr. Ransdell testified that the deceleration at that time did not indicate a problem. Subsequently, Dr. Ransdell left the hospital and returned to his office, a block and a half away, to see patients.

At 11:10 a.m., the nursing staff recorded variable decelerations of the fetal heartbeat. Dr. Ransdell was notified of the condition by telephone at 11:15 a.m. At 11:20 a.m., the nursing staff received a telephone order from Dr. Ransdell for type and cross-matching of Sandra's blood. The nursing staff telephoned Dr. Ransdell again at 11:35 a.m. and notified him of the fetal heart monitor strip. Dr. Ransdell ordered the nursing staff to insert a Foley catheter, give Sandra the drug atropine, and notify a pediatrician. These orders indicate Dr. Ransdell was preparing for a cesarean section.

Whether Dr. Ransdell arrived at the hospital at 11:38 a.m. or seven minutes later, at 11:45 a.m., was disputed. At 12:28 p.m., Dr. Ransdell delivered Bobby by cesarean section.

Appellant alleged that Bobby suffers from a seizure disorder, is very uncoordinated, and has made little advancement in his psycho-motor development which causes difficulty with his speech and causes him to drool. His condition has remained static and likely will not improve to any significant degree and will require him to take anti-convulsant drugs for the remainder of his life.

PROCEDURAL HISTORY:

This action was originally filed in 1985 by Sandra Juby on behalf of Bobby Juby against Dr. Ransdell, Dr. Herbert C. Hodes, and the Jane C. Stormont Hospital and Training School for Nurses (Stormont-Vail). Trial was scheduled for August 23, 1987, but was continued to August 27, 1987. On August 25, 1987, at the defendant's request the court ordered plaintiff's expert witness, Dr. David C. Abramson of Washington, D.C., to bring his 1980-1986 income tax returns to trial for cross-examination purposes. On August 27, 1987, prior to the start of the trial, plaintiff dismissed the claims against defendants Hodes and Stormont-Vail. On September 1, 1987, Dr. Abramson failed to provide copies of his

income tax returns and, although present, he was not allowed to testify at trial. Plaintiff moved for a mistrial, which the court denied. Plaintiff then moved for a dismissal without prejudice, and defendant moved for a directed verdict or a dismissal with prejudice. On February 1, 1988, the trial court ruled the case would be dismissed without prejudice but reserved determination of the conditions of dismissal for a later date.

On July 29, 1988, during a telephone conference, the court ruled that plaintiff would be required, as the terms and conditions of dismissal of the case without prejudice, to pay for the costs involved in trial preparation by the defense for Dr. Abramson's testimony. The plaintiff paid to defendant $10,817.41 and filed the present case on July 29, 1988.

On September 7, 1988, the trial court held a status conference. The court allowed plaintiff 60 days to employ an obstetrician/gynecologist (OB/GYN) expert witness to replace Dr. Abramson. The court further stated that no additional experts were to be employed by either party without approval of the court. Dr. Julius S. Piver was named as the expert witness to replace Dr. Abramson.

On November 7, 1988, plaintiff filed a motion to designate additional expert witnesses. The court denied the motion, finding that plaintiff failed to show any justification for the designation of additional experts to replace Dr. Abramson. On January 12, 1990, plaintiff filed a motion for clarification of the court's ruling on expert witnesses. On February 15, 1990, the court denied the motion.

At trial, plaintiff called Dr. Julius S. Piver, an OB/GYN, as an expert witness on the issues of negligence and causation and Dr. Judith Miles in rebuttal of defendant's expert witness, Dr. Bruce Buehler. Defendant called four expert witnesses: Dr. Henry W. Buck, Jr., Dr. Bruce A. Buehler, Dr. Solomon Batnitzky, and Dr. Roman Hiszcznskyj. Dr. Ransdell also testified on his own behalf. At the close of the evidence, the defendant's motion for a directed verdict was denied. The jury returned a verdict finding no fault on the part of Dr. Ransdell, Sandra Juby, Grady Coker, M.D., Herbert Hodes, M.D., or Larry Vandegarde, M.D. Plaintiff now appeals. We affirm.

The terms and conditions which the district court may impose upon dismissal of an action at the instance of the plaintiff are for the protection of the substantive rights of the defendants. The district court must weigh all the equities of the case, including the rights of the parties and how they will be affected, and what benefits or injuries may result to the respective sides in the controversy if a dismissal is granted. Upon review by an appellate court, the inquiry whether the district court abused its discretion in granting the plaintiff's motion to dismiss the action against the defendants without prejudice and in preserving any claim existing between the other parties to the lawsuit is confined to whether the situation and circumstances clearly show an abuse of discretion, *i.e.*, an arbitrary action that failed to apply the appropriate equitable and legal principles under the facts and circumstances of the case. *Patterson v. Brouhard*, 246 Kan. 700, 792 P.2d 983 (1990).

## I. LIMITING PLAINTIFF TO ONLY ONE EXPERT WITNESS.

Plaintiff first argues it was improper for the court to limit the number of plaintiff's expert witnesses during a status or discovery conference. She claims any such limitation should have been imposed during a pretrial conference, not during a discovery or status conference. The ruling occurred on September 7, 1988, during a telephone conference involving the court, counsel for plaintiff, and counsel for Ransdell. The transcript indicates it lasted about five minutes. The court ruled (1) that plaintiff would have 60 days to name another OB/GYN expert and (2) that without permission of the court no additional experts were to be employed by either party.

Under Rule 136 (1991 Kan. Ct. R. Annot. 113), the court may, at a discovery conference or other appropriate time, designate the time and place of discovery and restrict discovery to certain designated witnesses. In addition, the issues are identified and the possibilities of stipulations and settlement are often explored. There is an exchange of information on the issues of the case and appropriate discovery procedures are determined and ordered. The judge is to require completion of discovery within a definite number of days after the discovery conference has been conducted.

Here, the parties had a pretrial conference prior to the initial trial. Under K.S.A. 1991 Supp. 60-216(5), the limitation of the number of expert witnesses is a matter within the discretion of the court. Under the circumstances of this case, the district judge did not err when limiting the number of plaintiff's expert witnesses at the status or discovery conference.

Plaintiff next contends the trial court abused its discretion when it limited plaintiff to two expert witnesses. Plaintiff planned to use one of the experts as a rebuttal witness. Plaintiff asserts because she is the party with the burden of persuasion, expert medical testimony on the issues of negligence and causation is absolutely critical. Plaintiff argues her being limited to two expert witnesses while Dr. Ransdell used five expert witnesses placed undue influence upon the defendant's evidence. Plaintiff argues that if she had not been limited to two experts, she would have named a neuroradiologist and a pathologist to counter the defendant's experts, and either a neonatologist or perinatologist to testify as to negligence and causation.

Plaintiff's assertions are not correct. During the September 7, 1988, telephone conference, the trial court stated: "The parties may wish to discuss or have discussions with experts they are considering but as far as employment, there [are] not to be any experts employed by either party in addition to those already employed in the previous case unless leave of the Court is allowed."

In the original case, plaintiff was not limited to any number of experts. Plaintiff chose to have only two expert witnesses, Dr. Abramson and Dr. Miles. When Dr. Ransdell presented his defense in the second trial, Dr. Batnitzky, Dr. Hiszcznskyj, and Dr. Buck were called as witnesses. All three had previously been identified as trial experts almost three years earlier by the defendants. Dr. Ransdell was not allowed to call experts for the second trial who were not listed as defense experts for the first trial. Except for the fact that plaintiff was allowed to substitute an expert for Dr. Abramson, who had refused to provide a copy of his income tax returns, both parties were limited to the experts listed in the first trial.

The district judge, in the exercise of judicial discretion, has power to limit the number of expert witnesses at the pretrial

conference. A ruling in discretionary matters will not be disturbed on appeal unless there is an abuse of discretion. *Powers v. Kansas Power & Light Co.*, 234 Kan. 89, 99, 671 P.2d 491 (1983). After reviewing the record, we find under the circumstances the plaintiff has failed to show the trial court abused its discretion in limiting the number of plaintiff's expert witnesses.

## II. FAILURE TO STRIKE UNRESPONSIVE TESTIMONY AND TO ADMONISH THE JURY TO DISREGARD THE TESTIMONY.

Plaintiff next contends the trial court failed to strike certain unresponsive testimony of Dr. Buck and Dr. Hiszcznskyj and to admonish the jury to disregard the response. Plaintiff fails to brief the issue as it pertains to the testimony of Dr. Hiszcznskyj. Where the appellant fails to brief an issue, that issue is waived or abandoned. *Bazine State Bank v. Pawnee Prod. Serv., Inc.*, 245 Kan. 490, 495, 781 P.2d 1077 (1989), *cert. denied* 109 L. Ed. 2d 502 (1990).

The objectionable testimony of Dr. Buck occurred during cross-examination by plaintiff's attorney and is shown in italics:

"Q. At any rate, there is no indication in this record he came to the hospital after being notified at 11:15 by the nurse?
"A. He came to the hospital.
"Q. Well, excuse me, there is no indication in the record he came to the hospital between 11:15 and 11:45 or 11:38, whenever it was he got there; is there?
"A. Well, I don't know what this particular number is right here. I really don't.
"Q. Let me ask you another way—
"A. You know, you try to put this all together. Have written down 11:15, Dr. Ransdell notified. And then type and cross match written at 11:20. *Some people theorize that hospitals should hire people with stop watches to keep records because when people are busy working they aren't looking at clocks*, and trying to write these things down as best they can. Sometimes they write them on skirts. We are looking at times that don't necessarily agree exactly. *And so what difference does it make, you know.* I can't infer just when he arrived at the hospital except that it says Dr. Ransdell here.
"MR. SCHROER: Move to strike as not responsive.
"THE COURT: Overruled."

Plaintiff claims the statements were prejudicial and were afforded great weight by the jury. She contends the statement clearly indicates it is impossible for hospitals to keep accurate

times, hospitals should not have to keep track of the time, and it did not make any difference when defendant arrived. Plaintiff claims Dr. Buck's statement related to a critical issue and time frame, *i.e.*, when Dr. Ransdell arrived at the hospital and when he should have been present.

Plaintiff does not explain how the statements were prejudicial, or provide any support for her conclusion that the statements were afforded great weight by the jury. The statements do not indicate hospitals should not have to keep track of the time or that it did not make any difference when Dr. Ransdell arrived.

Three questions later, plaintiff's counsel asked Dr. Buck:

"Q. And it is a practice of all hospitals everywhere to try and accurately record as nearly as possible everything that is of significance; isn't that right?"

Dr. Buck responded:

"A. They attempt to do that, yes."

Plaintiff has failed to show the statements prejudiced the jury. The trial court error, if any, is harmless error. Harmless error is error which does not prejudice the substantial rights of a party. It affords no basis for a reversal of a judgment and must be disregarded. *Hagedorn v. Stormont-Vail Regional Med. Center*, 238 Kan. 691, 701, 715 P.2d 2 (1986).

## III. LIMITATION OF PLAINTIFF'S CROSS-EXAMINATION OF DEFENDANT AND DEFENDANT'S EXPERT WITNESSES.

· Plaintiff next contends her cross-examination of the defendant and defendant's witnesses on factors and elements underlying their opinions as to other possible causes of Bobby's injuries was erroneously restricted by the trial court.

In medical malpractice actions, "strong reliance has to be placed on expert rather than lay testimony." *Goheen v. Graber*, 181 Kan. 107, 115, 309 P.2d 636 (1957) (Robb, J., dissenting). The admission of expert testimony is based on necessity arising out of the particular facts of each case. Expert testimony is necessary where normal experience and qualifications of lay persons serving as jurors does not permit them to draw proper conclusions from the facts and circumstances of the case. *State v. Hodges*, 239 Kan. 63, 67, 716 P.2d 563 (1986).

The following questions were asked on cross-examination of Dr. Buehler, a pediatrician/geneticist, who testified that Sandra's alleged drug use caused Bobby's injuries:

"Q. [by MR. SCHROER] What I'm trying to get at, is it possible that there can be just a few cells killed because the lack of oxygen again' wasn't for very long or wasn't much a lack just a little bit. And then can there be some damage that—at all levels in between clear to death?

"MR. HECK: Objection to possibilities, Your Honor. .

. . . .

"MR. SCHROER: I think I should be allowed this line of questioning.
"THE COURT: Well, I think if you are asking about possibilities I think that's objectionable, I would sustain the question as you put it to the witness. You can inquire about that subject but not about possibilities.
"MR. SCHROER: I thought I should be permitted to do that on cross, Your Honor, not because of the same requirement on direct but I'll abide by your Honor's ruling.

. . . .

"Q. [by MR. SCHROER] Let me ask you to assume as I've already showed you, the neurologist opinions of Dr. Mills, that there was hypoxic encephalopathy. Is it possible you could have both a teratogenic cause and also have a cause from the OB process or delivery that could result in hypoxic encephalopathy also?
"MR. HECK: Objection form, possibility Your Honor.
"THE COURT: Sustained."

Similarly, the following questions were asked on cross-examination of Dr. Ransdell:

"Q. [by MR. SCHROER] Isn't it true a child can suffer some damage if the heart rate is below 100 for a prolonged period of time?
"MR. HECK: Objection to the form of the question. That has to be based on reasonable medical probability Your Honor. Also, not enough facts in the hypothetical which the witness can give an answer.
"MR. SCHROER: I would suggest it is cross-examination, Your Honor.
"MR. HECK: The standard [is] still the same if the Court please.
"THE COURT: Sorry?
"MR. HECK: The standard is still the same as it's related to the opinion unless we are dealing with guessing, speculation, and if we are, I think it has to be stated.

. . . .

"Q. [by MR. SCHROER] Would you agree that a baby could suffer some damage, but it might be less, if it wasn't very long?
"MR. HECK: Objection, Your Honor, same objection, on foundation. He said he doesn't know. Also not based on reasonable medical probability.
"THE COURT: Yes, sustained.

. . . .

"Q. [by MR. SCHROER] You can have brain damage without having hypoxia, can't you?

"MR. HECK: I am going to object again, Your Honor. Should be phrased as to reasonable degree of medical probability. And also foundation as relates to this witness. There is no pediatric neurologist.

"THE COURT: Well, sustained as to the standard only.

. . . .

"Q. [by MR. SCHROER] Did I ask you if there was a possibility that there was stress on the baby?

"MR. HECK: Objection, form, possibility.

"THE COURT: Yes, sustained.

. . . .

"Q. [by MR. SCHROER] Now, do you have—is it true that the more prolonged the heart depression is, the more serious is the damage from that depression?

"MR. HECK: Objection, calls for speculation unless we talk about probability, Your Honor. The same foundation objection, reasonable medical probability.

"THE COURT: I agree."

The following question was asked on cross-examination of Dr. Buck, an OB/GYN, who testified that Bobby did not suffer hypoxic encephalopathy as a result of defendant's negligence.

"Q. [by MR. SCHROER] Okay. Let me ask you, then, is it possible that this Apgar is lower because of depression of the fetal heart tones between 11:59 and 12:58?

"MR. HECK: Objection, form as to possibility.

"THE COURT: Yes, sustained."

During direct examination expert witnesses must "confine their *opinions* to relevant matters which are certain or probable, not those which are merely possible." *Nunez v. Wilson*, 211 Kan. 443, Syl. ¶ 1, 507 P.2d 329 (1973) (emphasis added). When medical experts are giving opinion testimony, the expert must give such opinions within a reasonable medical probability. "The expressions 'probably,' 'more likely than not,' and others of similar import are proper qualifications for a medical expert's opinion testimony if, taken as a whole, the testimony reflects an honest expression of professional opinion as to reasonable medical probabilities." 211 Kan. 443, Syl. ¶ 2.

Plaintiff asserts that the reasonable medical probability standard does not apply to cross-examination because on cross-examination the expert witness is not testifying as to his or her opinion. She argues that on cross-examination, the attorney is attempting to

discern the factors, elements, and mental processes considered by such expert in arriving at his opinion and that this is the only manner in which the credibility of the expert's opinion can be challenged.

Once the trial court has determined that a witness is qualified to testify as an expert witness, the court cannot regulate the factors or mental processes used by the expert in reaching his opinion or conclusion on the case. The factors and mental processes used by the expert "can only be challenged by cross-examination testing the witness' credibility." *City of Bonner Springs v. Coleman*, 206 Kan. 689, 695, 481 P.2d 950 (1971). Thus, to properly challenge the opinions and conclusions of an expert witness the examining party must be able to fully and effectively cross-examine the expert witness.

The importance of cross-examination of an expert witness has been recognized in numerous decisions. In *Timsah v. General Motors Corp.*, 225 Kan. 305, 317, 591 P.2d 154 (1979), we concluded that " '[t]he latitude permitted in the cross-examination of an expert witness is even wider than in the case of an ordinary opinion witness.' " (Quoting *Bott v. Wendler*, 203 Kan. 212, 228, 453 P.2d 100 [1969].) Great latitude is necessarily indulged in the cross-examination of an expert witness in order that the intelligence and powers of discernment of the witness, as well as capacity to form a correct judgment, may be submitted to the jury so it may have an opportunity for determining the value of his or her testimony. 225 Kan. at 317 (citing *Bourgeois v. State Highway Commission*, 179 Kan. 30, 34, 292 P.2d 683 [1956]).

On at least two occasions we have recognized that a party may cross-examine physicians and expert witnesses regarding possible causes of an injury. In *Gant v. Gas Service Co.*, 156 Kan. 685, 687, 135 P.2d 533 (1943), the court held that the district court did not err in allowing cross-examination of a physician regarding "whether it would be *possible* for a person to have sustained a permanent injury from the kind of a fall described by plaintiff." (Emphasis added.) Similarly, in *Timsah* the court concluded it was "appropriate to question these experts on other *possible* causes of the apparent defects." 225 Kan. at 317. (Emphasis added.)

Cross-examination of expert witnesses on possible causes of an injury is appropriate. The trial judge improperly limited plaintiff's cross-examination of defendant's expert witnesses.

If trial court error does not prejudice the substantial rights of a party, it affords no basis for a reversal of a judgment and must be disregarded. *Hagedorn v. Stormont-Vail Regional Med. Center*, 238 Kan. at 701. Our review of the record leads us to conclude that in this case the improper limitation of plaintiff's cross-examination of the experts was harmless error.

## IV. ALLOWING A WITNESS TO BE IMPEACHED WITH EXPUNGED CRIMINAL CONVICTIONS.

K.S.A. 60-421 prohibits the introduction into evidence of the conviction of a witness for a crime not involving dishonesty or false statement for the purpose of impairing the credibility of the witness. Plaintiff argues that the trial court improperly allowed defendant to impeach Sandra with evidence of three expunged convictions. The three convictions were: (1) a 1973 conviction for knowingly and with intent to defraud forging a prescription to obtain drugs (K.S.A. 21-3710); (2) a 1976 conviction for attempting to introduce a contraband substance, the drug Valium, into a penal institution (K.S.A. 21-3826); and (3) a 1982 conviction for obtaining a prescription-only drug by fraudulent means (K.S.A. 21-4214).

Expungement of criminal records is governed by K.S.A. 21-4619(f), which provides that "[a]fter the order of expungement is entered, the petitioner shall be treated as not having been convicted of the crime." Other sections provide exceptions to the general rule and specific circumstances under which the custodian of the expunged records may disclose the existence of the records. However, *these exceptions are inapplicable to the present action.* K.S.A. 21-4619 prohibits the district court from allowing the defendant to obtain the expunged criminal records of Sandra Juby. In addition, the Kansas Legislature specifically provided that once a conviction has been expunged, the witness may legally testify that he or she has not been convicted of the crime. K.S.A. 21-4619(h).

When a petition for expungement is filed, the court sets a date for hearing and gives notice to the prosecuting attorney. All pe-

titions for expungement are docketed. in the· original criminal action. Any person who may have relevant information about the petition may testify at the hearing.. The court may inquire into the background of the petitioner and has access to any reports or records relating to the petitioner that are on file with the Secretary of Corrections or the Kansas Parole Board.

The court shall order the petitioner's conviction expunged if it finds (1) the petitioner has not been convicted of a felony in the past two years and no proceeding involving any such crime is presently pending or being instituted against the petitioner; (2) the circumstances and behavior of the petitioner warrant the expungement; and (3) the expungement is consistent with the public welfare.

K.S.A. 21-4619 relates to expungement of the *fact of conviction*. With some exceptions, it prohibits the disclosure of the fact of conviction of a crime and the existence of records relating to that conviction if the conviction has been properly expunged. Where a conviction has been expunged, K.S.A. 21-4619 does not prohibit admission of evidence of acts constituting the crime; if those acts are relevant to a fact in issue. The acts must be proven by evidence other than evidence of the fact of conviction and the existence of records relating to the conviction.

For support that expunged criminal convictions cannot be used to impeach a witness, the plaintiff cites a federal district court case and cases from the Wisconsin Supreme Court and the Missouri Court of Appeals. In *Ann L. v. X Corp.*, 133 F.R.D. 433 (W.D.N.Y. 1990), the plaintiffs sought damages in products liability arising out of an injury to their small child. The defendant obtained possession of relevant records from the county's social service department about the injured child's parents. The plaintiffs moved for a protective order to suppress the records which had previously been ordered expunged by an Administrative Law Judge in accordance with a New York social service law. The federal court found the suppression order was a proper remedy where the defendants obtained records from the county department of social services without providing notice to the plaintiffs. Though the department had failed to comply with the expungement procedure as ordered by the Administrative Law Judge, the records were not discoverable.

In *Bergel v. Kassebaum*, 577 S.W.2d 863 (Mo. App. 1978), plaintiff was arrested in a shopping center as a possible suspect in a rape case. It was soon determined that plaintiff was not the person who had committed the rape and the plaintiff was released without being charged. Subsequently, the plaintiff brought a false imprisonment suit against an off-duty police officer, a police officer, and a private citizen. More than a year after his arrest, the plaintiff attempted to obtain the record of his arrest. Missouri law provided that if any person is arrested and not charged with an offense against the law within 30 days of arrest, all records of the arrest and of any detention or confinement incident thereto shall thereafter be closed records to all persons except the person arrested. If there is no conviction within one year after the records are closed, all records of the arrest and of any detention or confinement incident thereto shall be expunged. Plaintiff discovered the records of his arrest had been destroyed in accordance with the law.

During the trial, plaintiff attempted to introduce evidence of the expunged records. The trial court prohibited the introduction of that evidence. On appeal, the Missouri Court of Appeals found the statutory language does not support a partial expungement, and assumed where the legislature provides all records of the arrest and any detention or confinement incident thereto shall be expunged, it meant that the records should be destroyed. It determined that the destroyed records were not available to the plaintiff for use in his false imprisonment action.

In *State v. Anderson*, 160 Wis. 2d 435, 466 N.W.2d 681 (Ct. App. 1991), Anderson was charged and convicted of battery. After trial, Anderson's counsel discovered in the State's case file evidence that a State's witness had been convicted of a misdemeanor. The file also revealed that the conviction had been expunged pursuant to law. Anderson moved for a new trial because the State had failed to disclose to him material evidence which he could have used to impeach the witness. The State argued that because the witness' conviction had been expunged under the law, it was no longer a conviction which could be used to impeach the witness and, therefore, the State was not obligated to disclose the witness' conviction to the defendant. The Wisconsin Court of Appeals found that evidence of an expunged conviction is not

admissible to attack the credibility of a witness; thus, the fact that the State's witness had been convicted of a crime which had been expunged was not material evidence which the State was required to disclose to the defendant.

In *State v. Wilkins*, 215 Kan. 145, 523 P.2d 728 (1974), we reached the opposite conclusion. Frank Wilkins was found guilty by a jury of burglary and theft and was committed to the custody of the Secretary of Corrections. The State's evidence was indirect or circumstantial and defendant's guilt was largely based on possession and use of a stolen shotgun within three hours after the shotgun had been stolen. On appeal, Wilkins contended the trial court erred in refusing to issue a protective order against the use of a juvenile record of a defense witness. The question presented was whether the right to confrontation and cross-examination of witnesses under § 10 of the Kansas Constitution Bill of Rights and the Sixth Amendment to the United States Constitution takes precedence over statutory provisions against disclosure of juvenile records in the juvenile court.

The *Wilkins* court noted the question raised concerns about a witness, not the accused. It observed that our statutes which apply to evidence sought to be introduced to impeach the credibility of an accused are more restrictive than those which apply to witnesses generally. The court stated that a rule of exclusion of such evidence would be a double-edged sword. If adopted, the rule of exclusion would be operable both when a witness with a juvenile record is called to testify on behalf of the State and when such a witness is called by the accused. Here, Wilkins did not want the credibility of his witness impeached, but in the next case, if such a witness testifies against a defendant, the right of that defendant to test the credibility and truthfulness of the witness by cross-examination might well appear indispensable to a fair trial. The court held that the State's policy interest in protecting the confidentiality of a juvenile offender's record must yield to the right of effective cross-examination to test the credibility of a witness because of the right to confrontation.

We have not specifically determined whether expunged criminal convictions may be obtained by a defendant in a civil case and used in cross-examination of a witness or a party. The trial court, in ruling the expunged records could be used to cross-

examine Sandra, relied on the dicta from *Stephens v. Van Arsdale*, 227 Kan. 676, 693, 609 P.2d 972 (1980). *Van Arsdale* was an original action in mandamus against the clerk of the Sedgwick County District Court. The action arose from the clerk's denial of the press' access to certain court files of criminal proceedings. The press challenged the constitutionality of the expungement statute, claiming K.S.A. 21-4619 was invalid as an abridgement of the rights protected by the Bill of Rights of the Kansas Constitution or by the First and Fourteenth Amendments to the United States Constitution.

The *Van Arsdale* court noted that the right of the public to access to public records for public inspection is based upon common law. This common-law right to inspect public records has been buttressed in many states by statutory codification. Kansas statutes require all public records to be open unless they are closed by the judges of the court or by some statute. The court concluded there exists no absolute right of access to court records. After balancing the public's conditional right of access to court records on the one hand, and the provisions of K.S.A. 21-4619 on the other, the court concluded that the restriction on public access to the court records imposed by the statute was reasonable and served a valid and legitimate public purpose. The *Van Arsdale* court then commented:

"Furthermore, we must recognize the inherent power which courts have over their official records. In an unusual case, where a former offender is directly involved in civil litigation, a district court might in its discretion permit the release of certain documents contained in an expunged file in order to achieve the ends of justice." 227 Kan. at 693.

Plaintiff contends *Wilkins* does not apply because it was a criminal case involving the Sixth Amendment right of confrontation of witnesses against the accused, whereas this action is a civil action not involving the Sixth Amendment right of confrontation. Plaintiff contends the dicta from the *Van Arsdale* case is inapposite here because Sandra is not a former offender directly involved in litigation and this is not an unusual case.

Plaintiff further contends K.S.A. 21-4619 is a specific statute which controls over general statutory rules of evidence. A special statute prevails over a general statute unless it appears that the legislature intended to make the general act controlling. When

there is a conflict between a statute dealing generally with a subject and another statute dealing specifically with a certain phase of it, the specific statute controls unless it appears that the legislature intended to make the general act controlling. *State v. Williams*, 250 Kan. 730, Syl. ¶¶ 1, 3, 829 P.2d 892 (1992).

Defendant points out that Sandra's convictions were expunged after the original civil litigation had been initiated. He argues the only purpose the expungement served was to obliterate evidence of the mother's negligence. He claims that without those records evidence concerning Sandra's credibility as to her relationship with drugs would have been kept from the jury. Defendant asserts that when this litigation originally commenced in 1985, the convictions were clearly admissible to attack credibility under K.S.A. 60-421 because they involved dishonesty and because, along with other evidence, they indicated a habit of drug abuse by Sandra Juby and so were admissible under K.S.A. 60-450.

We continue to agree with the conclusion in *Van Arsdale* that the courts have inherent power over their official records. In an unusual case, where a defendant, whose former criminal convictions have been expunged, is directly involved in civil litigation, a district court might in its discretion permit the release of certain documents contained in an expunged file in order to achieve the ends of justice. Although it was error to admit the convictions themselves, we must now determine if their admission was reversible error.

Plaintiff argues the trial court improperly allowed the defendant to use the 1973, 1976, and 1982 convictions to imply that Sandra used drugs at the time of her pregnancy rather than using the convictions to impeach her credibility as authorized by K.S.A. 60-421. She further contends evidence of the expunged convictions was more prejudicial than probative and therefore should have been excluded. She relies on *Van Hoozer v. Farmers Insurance Exchange*, 219 Kan. 595, 613, 549 P.2d 1354 (1976), which stated: "It is the law of this state that even though evidence is relevant it should be excluded if its probative value is outweighed by its prejudicial effect."

We have similarly paraphrased K.S.A. 60-445 in other cases. That statute actually states:

"Except as in this article otherwise provided, the judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered."

The statute restricts the admission of such evidence if the party has not had reasonable opportunity to anticipate such evidence would be admitted. Here, there is no doubt that the plaintiff anticipated such evidence would be admitted. The sole purpose for expunging the witness' prior convictions was to keep the defendant from using the prior convictions to impeach the plaintiff's witness. Under the facts, K.S.A. 60-445 did not prohibit the introduction of the witness' three prior convictions.

The plaintiff asserts that the mother's 1973 conviction, which occurred more than three years prior to Bobby's birth, and the 1982 conviction, which occurred 6 years after the pregnancy and birth of Bobby, had little, if any, probative value. Plaintiff points out the lack of probative value of the 1973 and 1982 convictions is important because there is no evidence that Sandra took drugs during her pregnancy or that drugs were prescribed for her during the pregnancy. Plaintiff argues that the evidence could not be used to show a habit of drug abuse because three convictions in 10 years is an insufficient number of instances to warrant a finding of habit under K.S.A. 60-450:

"Evidence of specific instances of behavior is admissible to prove habit or custom if the evidence is of a sufficient number of such instances to warrant a finding of such habit or custom."

Further, plaintiff argues, these instances do not show habit of drug use at the time Bobby was born.

It is sometimes difficult to distinguish between character and habit. To have a habit one must have the disposition or character to do a particular thing. The fact of habit can be established by testimony of conduct over a period of time. The testimony of specific instances must add up to the fact of habit. There must be enough instances shown to warrant a finding of habit. Isolated or occasional instances of behavior will not prove habit. We agree with the plaintiff that the court erred in admitting the three prior convictions. The convictions were not sufficient for the court to admit as a habit.

Defendant responds that aside from the convictions there was independent evidence that Sandra Juby had taken various drugs during her pregnancy that could have caused Bobby's injuries. Debra White testified that in December of 1975 or January of 1976, she and a friend went to the Juby home to pick up crystal, a street amphetamine; while at the Juby household, she, her friend, Sandra, and Sandra's husband used crystal by a hypodermic needle injection. The witness further testified it was common knowledge that the Jubys were selling drugs while Sandra was pregnant. The defendant argues that since the jury found no fault on the part of Sandra Juby, the use of the criminal convictions was harmless error because it had no prejudicial effect in the jury's determination. "Harmless error is error which does not prejudice the substantial rights of a party. It affords no basis for a reversal of a judgment and must be disregarded." *Hagedorn v. Stormont-Vail Regional Med. Center*, 238 Kan. 691, 701, 715 P.2d 2 (1986).

We agree. The trial court improperly admitted the prior convictions, but the jury's determination that there was no fault on the part of Sandra Juby indicates the admission of the prior convictions was harmless. Under the facts of this case, the error did not prejudice the substantial rights of the plaintiff; therefore, the admission of the convictions affords no basis for reversal of the judgment and must be disregarded.

Affirmed.